## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT MILLER, INDIVIDUALLY, AND AS OWNER OF SPACEMAN MUSIC GROUP, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| v. | ) ) | Judge: |
| LACUNA 2150, LLC, JOSEPH "JOEY" CACCIATORE, INDIVIDUALLY, AND AS AGENT OF JOS. CACCIATORE & CO. | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>VERIFIED COMPLAINT AT LAW</u>

NOW COME Plaintiffs, Vincent Miller, and Spaceman Music Group, Inc. (hereinafter "Plaintiffs"), by and through his attorneys at the Raymond Law Group, and for their Verified Complaint, states as follows:

### PARTIES

1. Vincent Miller, an African-American male, is the owner of Spaceman Music Group.

2. Spaceman Music Group, LLC is a business involved in the producing, engineering and recording of vocals and musical compilations by musicians.

3. Joseph "Joey" Cacciatore (hereinafter "Cacciatore") is the owner and/or manager of the property located at 2150 S. Canalport Ave., Chicago, IL 60608, commonly known as "Lacuna Lofts."

4. Jos. Cacciatore & Co. is the property management company, and its agents, responsible for the management of the property commonly known as "Lacuna Artist Lofts", located at 2150 S. Canalport Ave., Chicago, IL 60608.

### FACTS

5.   On February 2016, Jos. Cacciatore & Co. and Plaintiff entered into a six (6) month lease for the commercial space commonly known as Lacuna Artist Lofts, 2150 S. Canalport Ave., Chicago, IL 60608, (hereafter "Lacuna Lofts") Suite 4C-2 on March 1, 2016, with an expiration date of August 31, 2016. This lease is attached and incorporated as **Exhibit A**.

6.   Plaintiff observed that the building had consisted of predominantly Caucasian business tenants, but did not pay any serious consideration to this, at the onset of his lease.

7.   During the duration of his tenancy, however, Plaintiff began to experience a number of discriminating actions against him from Defendants and its agents, because of his race.

8.   On or about March 10, 2016, Plaintiff was receiving a delivery of a small piece of furniture at the north entrance to Lacuna Lofts from a deliveryman.

9.   Before the deliveryman was able to get out of his delivery truck, a White male individual who later identified himself as "Joey Cacciatore", approached Plaintiff and the deliveryman, yelling out "What the f**k are you doing?!"

10.  Cacciatore then strongly demanded that Plaintiff and the deliveryman go to the loading docks.

11.  Plaintiff apologized and explained he had no knowledge nor did he receive any instructions on how to move small items into his unit.

12.  Defendant then guided Plaintiff to the loading dock which was occupied by an immense amount of garbage.

13.  Defendant went on to introduce himself as Joey Cacciatore, owner of Lacuna Lofts and mentions to Plaintiff that he and his father "had been running the whole block for 35 years".

14.  Plaintiff eventually completed delivery of his furniture, even though he was forced to use the unsanitary and unpleasant environment of the loading dock.

15. Plaintiff did not observe Cacciatore behaving this way towards other, non-African-American tenants who took delivery of larger items in the north entrance of Lacuna Lofts during his tenancy.

16. The next day, on March 11, 2016, Plaintiff noticed that the temperature in his unit was extremely hot, and his clients were beginning to complain about the temperature during their recording sessions.

17. Plaintiff noticed a vent was located in his space that was not distributing the building's climate-controlled air.

18. Plaintiff visited the units of other, non-African-American tenants of the building and found the air temperature of their units to be cooler, and less uncomfortable.

19. Plaintiff went to the management office located in the building to remedy this problem.

20. Upon arrival, Plaintiff recognized Cacciatore, and reintroduced himself.

21. Plaintiff gave Cacciatore his suite number and discussed the ventilation issues in his unit.

22. Plaintiff then proceeded to ask him if he could do something about the uncomfortably high air temperature in his unit, to which Cacciatore immediately, and emphatically responded "NO", without further explanation.

23. Plaintiff pressed for an explanation as to why nothing could be done about the air temperature in his unit, nevertheless, Cacciatore advised him to leave the office.

24. Plaintiff attempted to abate the stifling air temperatures in his suite by purchasing two electric fans, which did little to make the air temperature in his suite more comfortable.

25. On or about March 13, 2016, Plaintiff received a knock on his door from an unknown agent of Defendant's management office about a noise complaint.

26. Plaintiff, as a show of courtesy to his neighbors, spoke with all surrounding tenants about the use of his suite as a recording studio when he first moved in, and gave his fellow tenants his personal mobile phone number, with instructions to contact him if the music coming from his suite became a nuisance.

27. Although none of his neighbors notified him of any disturbances, Plaintiff apologized to management, and began playing music at a lower level, until 7:00 p.m. – well after most of Lacuna Lofts' businesses closed for the day.

28. On April 1, 2016, Plaintiff received a phone call from Susan M. Lacek ("Lacek"), who identified herself as an employee of Lacuna Lofts' management office.

29. Lacek alleged that on the evening of Wednesday, March 30, 2016, Plaintiff had been caught on the building's security camera, pointing a gun at another tenant of the building.

30. Plaintiff immediately denied these allegations.

31. Despite Plaintiff's denials, Lacek ordered Plaintiff to send a photograph of himself to her mobile phone.

32. Plaintiff complied and sent Lacek a photograph of himself immediately thereafter.

33. On or about April 5, 2016, Plaintiff encountered Cacciatore in the hallway outside of his suite and asked him about Lacek's allegations that Plaintiff had pointed a gun at another tenant.

34. Plaintiff requested to see the security camera footage Lacek had referred to during Lacek's phone conversation with Plaintiff on April 1, 2016.

35. Cacciatore quickly stated that the security camera footage had been given to the police, and that they would be conducting an investigation into the matter.

36. After Plaintiff's interaction with Cacciatore, Plaintiff walked to the parking lot where he encountered Lacek, and an unknown, White male employee of Lacuna Lofts' management team.

4

37. Lacek explained that Cacciatore was not a "happy camper" due to the gun related incident that allegedly took place on March 30, 2016.

38. Plaintiff explained to Lacek that he did not believe she was being truthful about the alleged incident, and pointed out Cacciatore's refusal to show him the alleged security camera footage.

39. Lacek responded that she did not know exactly if there was a gun involved, but that she saw "twelve black guys go into the building" on the night of March 30, 2016.

40. Plaintiff replied that he did not have any African American guests in his suite that night, and that his unit could only hold a maximum of seven occupants.

41. The unnamed male employee then stated that he had spoken to one of the alleged "twelve unknown black men", who stated that the group was there for a "Space Boy" and that they were "going to the studio".

42. Plaintiff replied that he was known as "Spaceman" and denied that he had any African-American guests that night.

43. Lacek then warned Plaintiff to "stop buzzing people in" and to greet his guests at the door to let them in the building personally instead.

44. Lacek also warned that Plaintiff needed to "start policing" his clients to prevent any other disturbances.

45. Throughout his tenancy at Lacuna Lofts, Plaintiff observed that no other business owned by non-African-American tenants, some of whom also had other music studios in the building, were required to personally meet their clients at the door to allow them entry into the building.

46. Lacek further warned Plaintiff that the Defendants had checked Plaintiff's "gang affiliation".

47. Plaintiff vehemently denied any alleged gang affiliation and expressed offense to Lacek's warning, and replied to her that he was never affiliated with any gangs, nor did he participate in gang-related activities.

48. Undeterred, Lacek continued to press Plaintiff with other gang-related questions about Plaintiff's neighbors, advising Plaintiff that it was "ok to snitch" to her about their gang affiliations.

49. Plaintiff replied that he did not know, and that he, at all times, conducted himself as a reputable business man in Chicago and Atlanta and has mentored over twenty aspiring musicians. Plaintiff again, re-emphasized that he did not have any gang affiliations.

50. Lacek then mentioned that Defendants had found Plaintiff's social media accounts, and that Plaintiff should "clean up some of the "s**t" on there and set a better example".

51. Lacek continued berating Plaintiff by asking him, "like, why do you call each other 'niggers', I don't get that."

52. Plaintiff, shocked and taken aback by her question and use of a racial epithet, abruptly walked away from Lacek and the unknown white male employee, with the feeling that he was being treated as a second-class citizen and harassed by the Defendants because of his race, despite the fact that he denied all alleged acts of gun violence which Defendants had accused him of.

53. Upon information and belief, other Caucasian tenants were not questioned about the alleged incident of gun violence.

54. On or about April 8, 2016, Plaintiff and three other African-American clients were leaving his suite, when they encountered Cacciatore in the hallway outside.

55. Cacciatore asked Plaintiff, "did all of those people come out of your space?"

56. Plaintiff, confused, replied that there were only four people in his suite, including himself, before he had left.

6

57. Cacciatore replied that "city regulations prevent[ed] other people from being in Plaintiff's unit". Cacciatore then asked, "when will you be leaving?"

58. Plaintiff replied that his lease was not up until August 30, 2016 and asked Cacciatore if they could talk in private about this matter instead.

59. Cacciatore continued and asked Plaintiff, "So you didn't get your five-day notice for eviction? Maybe lines of communication got mixed up, you should have gotten that by now."

60. Cacciatore then walked away, leaving Plaintiff embarrassed and ashamed before his clients who were present for the conversation.

61. On or about April 18, 2016, Defendants emailed Plaintiff, stating that "due to city regulations that require all units to have access to fresh air, all interior units without windows must be moved or expanded into a larger unit" and the Defendants would be contacting him shortly. *See* **Exhibit B**.

62. The same day, Defendants notified Plaintiff by email that they would not renew his lease. *See* **Exhibit C**.

63. On May 1, 2016, Plaintiff contacted Cacciatore via telephone to inquire about moving to a larger suite. He had inquired about any available suites in the building to Lacuna Lofts' management office previously, but had received no response. Cacciatore stated that someone had already occupied all available suites which were larger than Plaintiff's current suite.

64. Plaintiff then asked, "What about unit 4-11? It has been unoccupied for over a month according to your management office and I asked for permission to move in there two times already with no response."

65. Cacciatore, seemingly annoyed and agitated, responded, "Well I guess someone is in there now aren't they?"

7

66. Plaintiff, once again frustrated with the way that Defendants had treated him thus far, asked Cacciatore, "I'm tired of walking on thin ice and being harassed and humiliated by you and your staff. What is your problem with me? Is it because I am black?"

67. Cacciatore replied, "Oh no, we are great, we have been great, now that I have to evict you." Cacciatore then abruptly ended the phone conversation.

68. On May 2, 2016, Plaintiff e-mailed Defendants and asked them to allow him to stay until the end of his sublease, to the end of August, 2016.

69. That same day, Plaintiff tendered a payment for May rent to the management office of Lacuna Lofts, with a money order.

70. On May 2, 2016, Plaintiff received a signed letter from Defendants slipped under his door, stating that the letter in hand served as notice for the defendant to vacate the premises within five days for failure to pay rent.

71. Because Plaintiff had already paid his rent for May, Plaintiff had assumed that the letter was a mistake.

72. However, on or about May 9, 2016, Plaintiff was unable to access his suite, as his key would no longer unlock the door to his suite.

73. The next day, on May 10, 2016, Plaintiff contacted Defendants and demanded that he be let back into his suite. Defendants refused to grant him access to his suite and informed him that the Defendants had changed the locks to Plaintiff's suite.

74. Plaintiff informed Defendants that he had personal and business items still inside the suite, and was unable to operate his recording studio business. Nevertheless, Defendants refused Plaintiff's requests for access to his suite.

75. Plaintiff then contacted the Chicago Police Department to request assistance with retrieving his belongings.

76. The next day, on May 11, 2016, with the help of Chicago Police Officer Edward A. Spizzirri, Plaintiff was able to access his suite to retrieve his personal items.

77. Plaintiff did not receive notice of a forcible entry and detainer action filed against him or Spaceman Music Group by the Defendants.

78. Plaintiff, unable to find another suitable space to operate a recording studio in Chicago, and losing all of his clients due to Defendant's actions, Plaintiff relocated to Atlanta, Georgia, incurring significant costs in relocating both himself and his business.

79. Plaintiff grossed, on average, about $400.00 per day from the operation of his business from his suite at Lacuna Lofts, and has lost profits stemming from Defendants' wrongful eviction.

80. The loss of his suite through wrongful eviction, disturbances and acts of intimidation by Defendants and its agents, and the high air temperatures of his unit caused Plaintiff to lose thirty to forty-five client recording contracts, from mostly African-American clients.

81. Defendants' discriminatory actions had an adverse impact on Plaintiff's business and his reputation, due to the intimidating acts he was subjected to by the Defendants and its agents in front of clients, tenants, and prospective business partners.

82. Defendants' conduct has caused severe emotional distress to Plaintiff.

83. Defendants' outrageous conduct has interfered with Plaintiff's ability to conduct a business and earn a livelihood.

84. Defendants' outrageous conduct was in bad faith, willful and/or with wanton disregard for Plaintiff's rights.

85. Defendants' outrageous conduct against Plaintiff was perpetrated against him because of his race.

9

## COUNT I

**VIOLATION OF 42 USC 1981**
**DISCRIMINATION IN BENEFITS, TERMS AND PRIVILEGES OF RENTAL CONTRACT**

86.    Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set

forth herein.

87.    Plaintiff is an African-American male.

88.    Defendants intended to discriminate against Plaintiff because he is an African-American male.

89.    Defendants did not extend the same benefits, privileges and treatment afforded to non-African-

American tenants, to Plaintiff, on the basis of his race.

**WHEREFORE**, the Plaintiffs, Vincent Miller, and Spaceman Music Group, Inc., respectfully

request this Court to:

A)    Award Plaintiffs actual damages in the amount of $56,840;

B)    Award Plaintiffs their court costs; and

C)    Grant Plaintiffs such further or alternate relief as the Court may deem just and equitable.

## COUNT II

**VIOLATION OF 42 USC 1982**
**INTERFERENCE WITH PROPERTY RIGHTS BASED ON DISCRIMINATION**

90.    Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set

forth herein.

91.    Plaintiff is an African-American male.

92.    The Defendants interfered with Plaintiff's property rights on the basis of his race.

93.    But for Plaintiff being an African-American male, the Defendants would not have interfered with

Plaintiff's property rights.

**WHEREFORE**, the Plaintiffs, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court to:

A)    Award Plaintiffs actual damages in the amount of $56,840;

B)    Award Plaintiffs their court costs; and

C)    Grant Plaintiffs such further or alternate relief as the Court may deem just and equitable.

## COUNT III

### VIOLATION OF 775 ILCS 5/3-102
### RACIAL DISCRIMINATION IN TERMS OF A REAL ESTATE TRANSACTION IN VIOLATION OFTHE ILLINOIS HUMAN RIGHTS ACT

94.    Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set forth herein.

95.    Plaintiff is an African-American male.

96.    Plaintiff was subjected to unwelcome harassment and unfair treatment in the terms, privileges and benefits of his lease with the Defendant on the basis of his race.

97.    Defendant's treatment and harassment of Plaintiff made continued tenancy at the Subject Property burdensome and significantly less desirable than if the harassment were not occurring.

98.    The owner(s) of the building knew or should have known about the harassment Plaintiff had been experiencing at the hands of the Defendant, yet failed to remedy such harassment of Plaintiff.

**WHEREFORE**, the Plaintiffs, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court to:

A)    Exercise its supplemental jurisdiction over this State Law claim;

B)    Award Plaintiffs actual damages in the amount of $56,840;

C)    Award Plaintiffs their court costs; and

D)      Grant Plaintiffs such further or alternate relief as the Court may deem just and equitable.

## COUNT IV

## VIOLATION OF 775 ILCS 5/3-105.1
## HOSTILE ENVIRONMENT UNDER THE ILLINOIS HUMAN RIGHTS ACT

99.    Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set forth herein.

100.   Plaintiff is an African-American male.

101.   Plaintiff was subjected to intimidation, threats, and harassment when attempting to enjoy the privileges of his rental agreement with the Defendants because of his race.

102.   Defendants' intimidation, threats, and harassment directed toward Plaintiff created a hostile environment for Plaintiff in violation of his rights under the Illinois Human Rights Act.

**WHEREFORE**, the Plaintiffs, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court to:

A)      Exercise its supplemental jurisdiction over this State Law claim;

B)      Award Plaintiffs actual damages in the amount of $56,840;

C)      Award Plaintiffs their court costs; and

D)      Grant Plaintiffs such further or alternate relief as the Court may deem just and equitable.

## COUNT V

## VIOLATION OF 735 ILCS 5/9-101
## WRONGFUL EVICTION UNDER THE ILLINOIS FORCIBLE ENTRY AND DETAINER ACT

103.   Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set forth herein.

104.   At all relevant times, Plaintiff was entitled to possession, use, control, and enjoyment of and over the Subject Property.

105. Plaintiff was forcibly and wrongfully evicted, removed, and excluded from the Subject Property by the Defendants.

106. Defendants' unlawful and wrongful eviction of Plaintiff from the Premises was without notice or due process of law, and was in contravention of 735 ILCS 5/9-101 et seq.

**WHEREFORE**, the Plaintiffs, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court to:

A)    Exercise its supplemental jurisdiction over this State Law claim;

B)    Award Plaintiffs actual damages in the amount of $56,840;

C)    Award Plaintiffs their court costs; and

D)    Grant Plaintiffs such further or alternate relief as the Court may deem just and equitable.

## COUNT VI

## BREACH OF CONTRACT

107. Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set forth herein.

108. Defendant, without notice and for no just cause, terminated this contract on May 10, 2016 when it proceeded to change the locks and dispossess Plaintiffs from their commercial space.

109. Defendant's actions have resulted in Plaintiffs' inability to operate its business, and lost profits.

**WHEREFORE**, the Plaintiffs, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court to:

A)    Award Plaintiffs actual damages in the amount of $56,840;

B)    Award Plaintiffs their court costs; and

C)    Grant Plaintiffs such further or alternate relief as the Court may deem just and equitable.

## COUNT VII

**TRESPASS**

110. Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set forth herein.

111. On May 9, 2016, without prior notice or authorization from Plaintiffs, Defendant entered onto the Subject Property without Plaintiffs' consent and changed the locks to the front door.

112. At no time prior to this did Plaintiffs authorize Defendant's entry into the Subject Property.

113. Defendants had no legal justification for entering the Subject Property due to the fact that they had not filed a forcible entry and detainer action against the Plaintiffs nor had they obtained any order for an eviction of the Plaintiff's residence.

114. By so doing, Defendant engaged in intentional trespass onto the Subject Property in violation of Illinois law.

**WHEREFORE**, the Plaintiff, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court:

A)      Award Plaintiffs actual damages in the amount of $56,840;

B)      Award Plaintiffs their court costs; and

C)      Grant Plaintiffs such further or alternate relief as the Court may deem just.

**COUNT VIII**

**CONVERSION**

115. Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set forth herein.

116. On and before May 9, 2016, Plaintiffs owned and lawfully possessed the items listed in paragraph 19 of this complaint, all of which were in good working order.

117. On May 9, 2016 without prior consent from Plaintiffs, Defendant assumed control of this property and thereby converted it.

118. Plaintiffs' right to this property is absolute and unconditional, and no one else has any legal right to the property but Plaintiffs.

119. Defendant's assumption of control of this property was wrongful and without Plaintiffs' consent.

120. The Defendant's assumption of control over this property was of such a total and grievous nature that Plaintiff was completely dispossessed from the use or enjoyment of this property until May 11, 2016.

121. Defendant's outrageous conduct was in bad faith, willful and/or carried out with such wanton disregard for the rights of Plaintiffs that Plaintiffs are entitled to punitive damages.

**WHEREFORE**, the Plaintiff, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court to:

A) Award Plaintiffs actual compensatory damages of no less than $23,840.00;

B) Award Plaintiffs punitive damages of no less than $100,000.00;

C) Award Plaintiffs the costs of this action and reasonable attorney's fees; and

D) Grant such further or alternate relief as it deems just.

## COUNT IX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

122. Plaintiff realleges and incorporates by reference paragraphs 1 through 85 above as if fully set forth herein.

123. The above-referenced conduct of Defendant was extreme and outrageous.

124. Defendant and its agents perpetrated blatant and invidious acts of direct discrimination against Plaintiff because of Plaintiff's membership in a protected class.

125.  Defendant perpetrated a wrongful eviction upon Plaintiff in violation of the Illinois Forcible Entry and Detainer Act.

126.  The Defendant intended to cause severe emotional distress to Plaintiff, Vincent Miller, or in the alternative, acted with reckless disregard of the high probability that Mr. Miller would suffer severe emotional distress due to Defendant's conduct.

127.  At all relevant times Defendant knew, or should have known, that abruptly locking Plaintiff out of the Premises, among other things would:

   a.  Jeopardize Plaintiff's ability to conduct a business;

   b.  Interfere with Plaintiff's ability to earn a livelihood;

   c.  Severely affect Plaintiff's mental and emotional state;

   d.  Cause Plaintiff to worry and anguish concerning the loss of his business, equipment, and other personal property that Plaintiff cannot afford to replace; and

128.  Defendant knew or should have known that its discriminatory conduct would cause severe emotional distress to Plaintiff, Vincent Miller.

129.  Defendant's outrageous conduct is the actual and proximate cause of Plaintiff's severe emotional distress.

   **WHEREFORE**, the Plaintiff, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court:

   A)  Award Plaintiff compensatory damages in an amount of no less than $50,000;

   B)  Award Plaintiff compensatory damages for their extreme and/or severe emotional distress, in the amount of no less than $50,000

   C)  Award Plaintiff punitive damages in an amount of no less than $100,000;

   D)  Award Plaintiff the costs of this action and reasonable attorney's fees; and

16

E)     Grant such further or alternate relief as it deems just.


Respectfully submitted,
VINCENT MILLER D/B/A SPACEMAN MUSIC
GROUP


BY: /s/ Louis C. Raymond, II
Attorney for Plaintiff


Atty No. 56526
Kevin C. Cruz
Louis C. Raymond II
Raymond Law Group
9901 S. Western, Ste. 208
Chicago, IL 60604
312-987-9737

## <u>VERIFICATION PURSUANT TO 28 U.S.C.A. § 1746</u>

Vincent Miller the owner of Spaceman Music Group, also individually named in this Complaint, declares, under penalty of perjury that the foregoing is true and correct, except as to matters stated to be on information and belief, and as to such matters Mr. Miller certifies as aforesaid that he verily believes the same to be true.

5/26/17
_____
DATE

_____
Vincent Miller