## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:17 CV 04088 |
| | ) | Judge Andrea R. Wood |
| LACUNA2150, LLC, JOSEPH V. "JOEY" | ) | |
| CACCIATORE, individually, and as Agent of Jos. | ) | |
| Cacciatore & Co. Real Estate, Inc., SUSAN M. | ) | |
| LACEK, individually, and as Agent of Jos. | ) | |
| Cacciatore & Co. Real Estate, Inc., JOSEPH P. | ) | |
| CACCIATORE, individually, and as Beneficiary of | ) | |
| Chicago Land Trust Co. Trust #10-1491 and | ) | |
| #10-2000, CHICAGO LAND TRUST CO. TRUST | ) | |
| #10-1491 AND #10-2000, and JOS. | ) | |
| CACCIATORE & CO. REAL ESTATE, INC. | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT AT LAW

NOW COMES Plaintiff, Vincent Miller, by and through his attorneys at the Community

Activism Law Alliance, and for his First Amended Verified Complaint, states as follows:

### PARTIES

1.    Vincent Miller, (hereinafter "Miller" or "Plaintiff") an African-American male, is the owner of

Spaceman Music Group, LLC, and the former tenant of 2150 South Canalport, Unit 4C-2, Chicago,

IL 60608, (hereinafter, the "Subject Property), located in the building known as the Lacuna Artist's

Lofts, 2150 South Canalport, Chicago, IL 60608 (hereinafter, the "Building"). Spaceman Music

Group, LLC is a business involved in the producing, engineering and recording of vocals and

musical compilations by musicians, formerly located at the Subject Property.

2. Lacuna2150, LLC (hereinafter "Lacuna") is the "Landlord Agent", pursuant to the rental agreement for the Subject Property signed by Miller (hereinafter, the "Lease"), accepted and countersigned by an agent of Lacuna2150, LLC.

3. Joseph V. "Joey" Cacciatore (hereinafter "Cacciatore"), at all times during the events in question, held himself out to Miller as the property manager and owner of the Building, or as an agent of defendant Jos. Cacciatore & Co. Real Estate, Inc.

4. Susan M. Lacek (hereinafter "Lacek") is an employee or agent of defendant Jos. Cacciatore & Co. Real Estate, Inc.

5. Chicago Land Trust Co. Trusts # 10-1491 and # 10-2000 (hereinafter, the "Trusts") are, the entities which own the Building, being held out as the "Landlord" in the Lease signed by Miller.

6. Joseph P. Cacciatore is a beneficiary of Chicago Land Trust Co. Trusts # 10-1491 and # 10-2000.

7. Jos. Cacciatore & Co. Real Estate, Inc. (hereinafter "JC&C"), is the property management company responsible for the management of the Building, which held itself out as "Managing Agent" in Miller's Lease with Lacuna, and as "Lacuna Management".

## JURISDICTION AND VENUE

8. Jurisdiction is proper in the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 USC § 1331, as this Complaint alleges violations of 42 USC § 1981 and 1982; all Illinois State Law claims are subject to supplemental jurisdiction pursuant to 28 USC § 1367(a) as these claims are part of the "same case or controversy" as a claim over which this Court has original jurisdiction.

9. Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division, as all events and occurrences arising from this lawsuit transpired within the City of

Chicago, County of Cook, State of Illinois, and all Parties reside, or operate their principal place of business therein, pursuant to 28 USC § 1391.

**FACTS**

10. On February 23, 2016, Lacuna and Miller entered into a six (6) month lease for the Subject Property, to begin on March 1, 2016, with an expiration date of August 31, 2016. The Lease is attached and incorporated as **Exhibit A**.

11. Miller observed that the building had consisted of predominantly Caucasian business tenants, but did not pay any serious consideration to this, at the onset of his lease.

12. During the duration of his tenancy, however, Miller began to experience a number of discriminating actions against him from Lacuna, JC&C, Cacciatore, Lacek, and their agents, because of his race.

13. On or about March 10, 2016, Miller was receiving a delivery of a small piece of furniture at the north entrance to Lacuna Lofts from a deliveryman.

14. Before the deliveryman was able to get out of his delivery truck, a White male individual who later identified himself as "Joey Cacciatore", approached Miller and the deliveryman, yelling out "What the f**k are you doing?!"

15. Cacciatore then strongly demanded that Miller and the deliveryman go to the loading docks.

16. Miller apologized and explained he had no knowledge nor did he receive any instructions on how to move small items into the Subject Property.

17. Cacciatore then guided Miller to the loading dock which was occupied by an immense amount of garbage.

18. Cacciatore went on to introduce himself as "Joey Cacciatore", "owner" of Lacuna Lofts, and mentioned to Miller that he and his father "had been running the whole block for 35 years".

19. Miller eventually completed delivery of his furniture, even though he was forced to use the unsanitary and unpleasant environment of the loading dock.

20. Miller did not observe Cacciatore behaving this way towards other, non-African-American tenants who took delivery of larger items in the north entrance of Lacuna Lofts during his tenancy.

21. The next day, on March 11, 2016, Miller noticed that the ambient temperature in the Subject Property was extremely high, and his clients were beginning to complain about the ambient temperature during their recording sessions.

22. Miller also noticed a building heating and air ventilation duct was located in the Subject Property, but was not distributing the building's climate-controlled air.

23. Miller visited the units of other, non-African-American tenants of the building and found the air temperature in their units to be cooler, and less uncomfortable.

24. Miller subsequently went to the management office located in the Building to seek assistance with the ambient temperature in the Subject Property.

25. Upon arrival, Miller recognized Cacciatore, and reintroduced himself.

26. Miller gave Cacciatore his suite number and discussed the ventilation issues in the Subject Property.

27. Miller then proceeded to ask him if he could do something about the uncomfortably high air temperature in the Subject Property, to which Cacciatore immediately, and emphatically responded "NO", without further explanation.

28. Miller pressed for an explanation as to why nothing could be done about the air temperature in the Subject Property, nevertheless, Cacciatore advised him to leave the office.

29.    Miller attempted to abate the stifling air temperatures in his suite by purchasing two electric fans, which did little to make the air temperature in the Subject Property more comfortable.

30.    On or about March 13, 2016, Miller received a knock on his door from an unknown agent of the Building's management office to inform him about a noise complaint made by an unknown neighbor.

31.    Miller, as a show of courtesy to his neighbors, spoke with all surrounding tenants about the use of his suite as a recording studio when he first moved in, and gave his fellow tenants his personal mobile phone number, with instructions to contact him if the music coming from his suite became a nuisance.

32.    Although none of his neighbors notified him of any disturbances, Miller apologized to management, and began playing music at a lower level, until 7:00 p.m. – well after most of the Building's' business tenants closed for the day.

33.    Throughout the duration of his tenancy, Miller did not receive any written notice from any Defendants regarding any alleged noise complaints.

34.    On April 1, 2016, Miller received a phone call from Lacek, who identified herself as an employee of Lacuna Lofts' "management office."

35.    Lacek alleged that on the evening of Wednesday, March 30, 2016, Miller had been caught on the building's security camera, pointing a gun at another tenant of the building.

36.    Miller immediately denied these allegations.

37.    Despite Miller's denials, Lacek ordered Miller to send a photograph of himself to her mobile phone.

38.    Miller complied and sent Lacek a photograph of himself immediately thereafter.

39. On or about April 5, 2016, Miller encountered Cacciatore in the hallway outside of the Subject Property and asked him about Lacek's allegations that Miller had pointed a gun at another tenant.

40. Miller requested to see the security camera footage Lacek had referred to during Lacek's phone conversation with Miller on April 1, 2016.

41. Cacciatore quickly stated that the security camera footage had been given to the police, and that they would be conducting an investigation into the matter.

42. After Miller's interaction with Cacciatore, Miller walked to the parking lot where he then encountered Lacek, and an unknown, White male employee of JC&C.

43. Lacek explained that Cacciatore was not a "happy camper" due to the gun related incident that allegedly took place on March 30, 2016.

44. Miller explained to Lacek that he did not believe she was being truthful about the alleged incident, and pointed out Cacciatore's refusal to show him the alleged security camera footage.

45. Lacek responded that she did not know exactly if there was a gun involved, but that she saw "twelve black guys go into the building" on the night of March 30, 2016.

46. Miller replied that he did not have any African American guests in his suite that night, and that the Subject Property could only hold a maximum of seven occupants.

47. The unidentified male employee of JC&C then stated that he had spoken to one of the alleged "twelve unknown black men", who stated that the group was there for a "Space Boy" and that they were "going to the studio".

48. Miller replied that he was known as "Spaceman" and denied that he had any African-American guests that night.

49. Lacek then warned Miller to "stop buzzing people in" and to greet his guests at the door to let them in the building personally instead.

50.   Lacek also warned that Miller needed to "start policing" his clients to prevent any other disturbances.

51.   Throughout his tenancy at Lacuna Lofts, Miller observed that no other business owned by non-African-American tenants, some of whom also had other music studios in the building, were required to personally meet their clients at the door to allow them entry into the building.

52.   Lacek further warned Miller that JC&C had checked Miller's "gang affiliation".

53.   Miller vehemently denied any alleged gang affiliation and expressed offense to Lacek's warning, and replied to her that he was never affiliated with any gangs, nor did he participate in gang-related activities.

54.   Undeterred, Lacek continued to press Miller with other gang-related questions about Miller's neighbors, advising Miller that it was "ok to snitch" to her about their gang affiliations.

55.   Miller replied that he did not know, and that he, at all times, conducted himself as a reputable business man in Chicago and Atlanta and has mentored over twenty aspiring musicians. Miller again, re-emphasized that he did not have any gang affiliations.

56.   Lacek then mentioned that JC&C had found Miller's social media accounts, and that Miller should "clean up some of the "s**t" on there and set a better example".

57.   Lacek continued berating Miller by asking him, "like, why do you call each other 'ni**ers', I don't get that."

58.   Miller, shocked and taken aback by her question and use of a racial epithet, abruptly walked away from Lacek and the unknown white male employee, with the feeling that he was being treated as a second-class citizen and harassed by the Defendants because of his race, despite the fact that he denied all alleged acts of gun violence which Defendants had accused him of.

59. Upon information and belief, other Caucasian tenants were not questioned about the alleged incident of gun violence which allegedly took place on March 30, 2016.

60. On or about April 8, 2016, Miller and three other African-American clients were leaving the Subject Property, when they encountered Cacciatore in the hallway outside.

61. Cacciatore asked Miller, "did all of those people come out of your space?"

62. Miller, confused, replied that there were only four people in his suite, including himself, before he had left.

63. Cacciatore replied that "city regulations prevent[ed] other people from being in the [Miller's] unit". Cacciatore then asked, "when will you be leaving?"

64. Miller replied that his lease was not up until August 30, 2016 and asked Cacciatore if they could talk in private about this matter instead.

65. Cacciatore continued and asked Miller, "So you didn't get your five-day notice for eviction? Maybe lines of communication got mixed up, you should have gotten that by now."

66. Cacciatore then walked away, leaving Miller embarrassed and ashamed before his clients who were present for the conversation.

67. On or about April 18, 2016, "Lacuna Management", which appeared to be an e-mail account operated by either Lacuna or JC&C, emailed Miller, stating that "due to city regulations that require all units to have access to fresh air, all interior units without windows must be moved or expanded into a larger unit" and the Defendants would be contacting him shortly. *See* **Exhibit B**.

68. Miller found this strange, as he had an air vent which was located in the Subject Property, but was inoperable, despite his complaints to Cacciatore and JC&C, who refused to make the air vent operational.

69. The same day, Cacciatore notified Miller by e-mail that they would not renew his lease "Due to a number of noise complaints, illegal substances on premise [*sic*] and possible acts of violence on camera." *See* **Exhibit C**. Strangely, Cacciatore also offered "the Remix Project Recording Studio conveniently located on the 3rd floor available for rent".

70. On May 1, 2016, Miller contacted Cacciatore via telephone to inquire about moving to a larger suite. He had inquired about any available suites in the building to Lacuna Lofts' management office previously, but had received no response. Cacciatore stated that someone had already occupied all available suites which were larger than Miller's current suite.

71. Miller then asked, "What about unit 4-11? It has been unoccupied for over a month according to your management office and I asked for permission to move in there two times already with no response."

72. Cacciatore, seemingly annoyed and agitated, responded, "Well I guess someone is in there now aren't they?"

73. Miller, once again frustrated with the way that Defendants had treated him thus far, asked Cacciatore, "I'm tired of walking on thin ice and being harassed and humiliated by you and your staff. What is your problem with me? Is it because I am black?"

74. Cacciatore replied, "Oh no, we are great, we have been great, now that I have to evict you." Cacciatore then abruptly ended the phone conversation.

75. On May 2, 2016, Miller e-mailed Defendants and asked them to allow him to stay until the end of his sublease, to the end of August, 2016.

76. That same day, Miller tendered a payment for May rent to the management office of Lacuna Lofts, with a money order.

77.     On May 2, 2016, Miller received a signed letter from Defendants slipped under his door, stating that the letter in hand served as notice for the defendant to vacate the premises within five days for failure to pay rent.

78.     Because Miller had already paid his rent for May, Miller had assumed that the letter was a mistake.

79.     However, on or about May 9, 2016, Miller was unable to access his suite, as his key would no longer unlock the door to his suite.

80.     The next day, on May 10, 2016, Miller contacted Lacuna's management office, Cacciatore, and JC&C, and demanded that he be let back into his suite. Lacuna's management office refused to grant him access to his suite and informed him that the Lacuna had changed the locks to Miller's suite. Miller also sent a reply e-mail to Cacciatore requesting access to the Subject Property. *See* **Exhibit C**. Miller did not receipt a reply to this e-mail.

81.     Miller informed Cacciatore that he had personal and business items still inside the suite, and was unable to operate his recording studio business. Nevertheless, Cacciatore refused Miller's requests for access to his suite.

82.     Miller then contacted the Chicago Police Department to request assistance with retrieving his belongings.

83.     The next day, on May 11, 2016, with the help of Chicago Police Officer Edward A. Spizzirri, Miller was able to access his suite to retrieve his personal items.

84.     Miller did not receive notice of a forcible entry and detainer action filed against him or Spaceman Music Group by JC&C, or any other named Defendants.

85.     Miller, unable to find another suitable space to operate a recording studio in Chicago, and losing all of his clients due to the Defendants' actions, Miller relocated to Atlanta, Georgia, incurring

significant costs in relocating both himself and his business, including, but not limited to, the forced sale of all his recording equipment.

86. Miller grossed, on average, about $400.00 per day from the operation of his business from his suite at Lacuna Lofts, and has lost profits stemming from Defendants' wrongful eviction.

87. The loss of the Subject Property through wrongful eviction, disturbances and acts of intimidation from Defendant Cacciatore and agents of JC&C and Lacuna, and the high air temperatures of the Subject Property caused Miller to lose thirty to forty-five client recording contracts, from mostly African-American clients.

88. Defendants' discriminatory actions had an adverse impact on Miller's business and his reputation, due to the intimidating acts he was subjected to by the Defendants and its agents in front of clients, tenants, and prospective business partners.

89. Defendants' conduct has caused severe emotional distress to Miller.

90. Defendants' outrageous conduct has interfered with Miller's ability to conduct a business and earn a livelihood.

91. Defendants' outrageous conduct was in bad faith, willful and/or conducted with wanton disregard for Miller's rights.

92. Defendants' outrageous conduct against Miller was perpetrated against him because of his race.

## COUNT I

### VIOLATION OF 42 USC 1981
### DISCRIMINATION IN BENEFITS, TERMS AND PRIVILEGES OF A RENTAL CONTRACT
*As to all Defendants*

93. Miller realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

94. Miller is an African-American male.

95. Defendants JC&C, Joseph P. Cacciatore, the Trusts, and Lacuna intended to discriminate, or ratified the discriminatory conduct of their agents, Lacek and Cacciatore, against Miller because he is an African-American male.

96. Defendants did not extend the same benefits, privileges and treatment afforded to non-African-American tenants, to Miller, on the basis of his status as an African-American.

**WHEREFORE**, the Plaintiff, Vincent Miller, respectfully requests this Court to:

A)      Award Plaintiff actual damages in an amount to be determined at trial;

B)      Award Plaintiff punitive damages in an amount to be determined at trial;

C)      Award Plaintiff his court costs, costs of suit, and reasonable attorney's fees; and

D)      Grant Plaintiff such further or alternate relief as the Court may deem just and equitable.

<u>**COUNT II**</u>

**VIOLATION OF 42 USC 1982**
**INTERFERENCE WITH PROPERTY RIGHTS BASED ON DISCRIMINATION**
*As to All Defendants*

97. Plaintiff realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

98. Plaintiff is an African-American male.

99. Defendants JC&C, Joseph P. Cacciatore, Lacuna, and the Trusts directly interfered with, or ratified Cacciatore and Lacek's conduct in interfering with Plaintiff's property rights on the basis of his status as an African-American.

100. But for Plaintiff being African-American, the Defendants would not have interfered with, or ratified their agents' conduct in interfering with, Plaintiff's property rights.

**WHEREFORE**, the Plaintiff, Vincent Miller, respectfully requests this Court to:

A)      Award Plaintiff actual damages in an amount to be determined at trial;

B)      Award Plaintiff punitive damages in an amount to be determined at trial;

C)      Award Plaintiff his court costs, costs of suit, and reasonable attorney's fees; and

D)      Grant Plaintiff such further or alternate relief as the Court may deem just and equitable.

**COUNT III**

**VIOLATION OF 775 ILCS 5/3-102**
**RACIAL DISCRIMINATION IN TERMS OF A REAL ESTATE TRANSACTION**
**IN VIOLATION OFTHE ILLINOIS HUMAN RIGHTS ACT**
*As to All Defendants*

101. Plaintiff realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

102. Plaintiff is an African-American male.

103. Plaintiff was subjected to unwelcome harassment and unfair treatment in the terms, privileges and benefits of his Lease with the Defendants on the basis of his race.

104. Plaintiff was treated with hostility and derision by Defendants Cacciatore, Lacek, and JC&C on the basis of his race, with such conduct being ratified by Joseph P. Cacciatore, Lacuna, and the Trusts. As a result, Plaintiff was denied the opportunity to rent another unit in the Building, based on his race.

105. Defendants' treatment and harassment of Plaintiff, or the ratification and approval of such treatment and harassment of Plaintiff made continued tenancy at the Subject Property burdensome and significantly less desirable than if the harassment were not occurring.

106. Defendants Joseph P. Cacciatore and the Trusts, the owner(s) of the Building, and management personnel of the Building, Lacuna, Cacciatore, Lacek, and JC&C, knew or should have known about the harassment Plaintiff had been experiencing at the hands of the Defendants, yet failed to remedy such harassment of Plaintiff.

**WHEREFORE**, the Plaintiff, Vincent Miller, respectfully requests this Court to:

A)      Exercise its supplemental jurisdiction over this State Law claim pursuant to 42 USC 1367;

B)      Award Plaintiff actual damages in an amount to be determined at trial;

C)      Award Plaintiff punitive damages in an amount to be determined at trial pursuant to 775 ILCS 5/10-102;

D)      Award Plaintiff his court costs, costs of suit, and reasonable attorney's fees; and

E)      Grant Plaintiff such further or alternate relief as the Court may deem just and equitable.

## COUNT IV

### VIOLATION OF 775 ILCS 5/3-105.1
### HOSTILE ENVIRONMENT UNDER THE ILLINOIS HUMAN RIGHTS ACT
*As to all Defendants*

107. Plaintiff realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

108. Plaintiff is an African-American male.

109. Plaintiff was subjected to intimidation, threats, and harassment, because of his race, by Lacek, Cacciatore, and Lacuna, such conduct being ratified or approved by Defendants Joseph P. Cacciatore, the Trusts, JC&C, and Lacuna, when attempting to enjoy the privileges of his rental agreement with Defendants Lacuna and the Trusts.

110. Plaintiff was further subjected to abnormally high ambient temperatures in the Subject Property due to Defendants Cacciatore and JC&C's refusal to fix the air vent in the Subject Property, because of his race.

111. Defendants' intimidation, threats, and harassment directed toward Plaintiff created a hostile environment for Plaintiff in violation of his rights under the Illinois Human Rights Act.

**WHEREFORE**, the Plaintiff, Vincent Miller, respectfully requests this Court to:

A)      Exercise its supplemental jurisdiction over this State Law claim pursuant to 42 USC 1367;

B)      Award Plaintiff actual damages in an amount to be determined at trial;

C)      Award Plaintiff punitive damages in an amount to be determined at trial pursuant to 775 ILCS 5/10-102;

D)      Award Plaintiff their court costs, costs of suit and reasonable attorney's fees; and

E)      Grant Plaintiff such further or alternate relief as the Court may deem just and equitable.

<u>**COUNT V**</u>
**COMMON LAW WRONGFUL EVICTION**
*As to all Defendants*

112.   Plaintiff realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

113.   At all relevant times, Plaintiff was entitled to possession, use, control, and enjoyment of and over the Subject Property, pursuant to the lease between Plaintiff and Defendant Lacuna. *See* **Exhibit A**.

114.   Plaintiff was forcibly and wrongfully evicted, removed, and excluded from the Subject Property by Defendant JC&C, with the consent or approval of Cacciatore, Lacek, Lacuna, Joseph P. Cacciatore, and the Trusts.

115.   Defendants' unlawful and wrongful eviction of Plaintiff from the Premises was without notice or due process of law, and was in contravention of common law and 735 ILCS 5/9-101 *et seq*.

116.   Section 9-101 of the Illinois Forcible Entry and Detainer Act states, in pertinent part, that: "No person shall make an entry into lands or tenements except in cases where entry is allowed by law, and in such cases he or she shall not enter with force, but in a peaceable manner." 735 ILCS 5/1-101 (WEST 2018)

117. The Forcible Entry and Detainer Act prohibits any actual or constructive self-help through force to settle a dispute over possession of real property, including changing locks or locking someone out of his land. *Fortech, L.L.C. v. R.W. Dunteman Co., Inc.*, 366 Ill. App. 3d 804, 814 (1st Dist. 2006).

118. A person seeking possession of real estate must use [the remedies available to persons under the Forcible Entry and Detainer Act] rather than use force. *Heritage Pullman Bank v. Am. Nat. Bank & Tr. Co. of Chicago*, 164 Ill. App. 3d 680, 686 (1st Dist. 1987) (citing *Ross v. Youngman*, 125 Ill.App. 494, 496, (3rd Dist. 1906); *Phelps v. Randolph*, 147 Ill. 335, 341 (1893).

119. Although the Forcible Entry and Detainer Act does not authorize a statutory private right of action for wrongful eviction under the Forcible Entry and Detainer Act, wrongful eviction is an actionable common law tort under Illinois law. *Burnex Oil Co. v. Floyd*, 4 Ill. App. 3d 627, 630 (1st Dist. 1971); *Cochrane v. Tuttle*, 75 Ill. 361 (1874); *Leiter v. Day*, 35 Ill. App. 248, 251 (1st Dist. 1889).

120. To allege a cause of action for wrongful eviction, one needs only to allege that he was properly on the premises, and that he was wrongfully removed from those premises. *International Insurance Co. v. Rollprint Packaging Products. Inc.*, 312 Ill.App.3d 998 (1st Dist. 2000); *Z.R.L Corp. v. Great Central Insurance Co.*, 156 Ill.App.3d 856, (1st Dist. 1987).

121. Defendants forcibly entered and unlawfully withheld possession of the Subject Property from Plaintiff without due process of law, or ratified its' agents conduct in doing so.

122. Defendants did not file any proceeding under the Forcible Entry and Detainer Act in The Circuit Court of Cook County against the Plaintiff to gain possession of the Subject Property.

123. Instead, Defendants engaged in self-help by ousting Plaintiff from the Subject Property by forcibly entering the Subject Property and changing the locks.

124. Plaintiff has been damaged in the amount of Defendants' use and occupancy since May 9, 2016 and ongoing, plus the amount of any actual damages and court costs caused by Defendants' forcible entry and detainer of the Subject Property.

**WHEREFORE**, the Plaintiff, Vincent Miller, respectfully requests this Court to:

A)      Exercise its supplemental jurisdiction over this State Law claim pursuant to 42 USC 1367;

B)      Award Plaintiff actual damages in an amount to be determined at trial;

C)      Award Plaintiff punitive damages in an amount to be determined at trial;

D)      Award Plaintiff his court costs, costs of suit, and reasonable attorney's fees; and

E)      Grant Plaintiff such further or alternate relief as the Court may deem just and equitable.

<u>**COUNT VI**</u>

**BREACH OF CONTRACT**
*As to Lacuna, Joseph P. Cacciatore, and the Trusts*

125. Plaintiff realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

126. Defendant Lacuna, acting as agent for Defendants Joseph P. Cacciatore and the Trusts, entered into a Lease for the Subject Property. *See* **Exhibit A**.

127. At all times, Miller satisfied his duties under the contract by adhering to Lease rules and regulations, and paying his rent on time, pursuant to the Lease.

128. Defendant Lacuna, acting as agent for Defendants Joseph P. Cacciatore and the Trusts, without notice and for no just cause, prematurely, and wrongfully terminated the Lease on May 10, 2016 when its agents JC&C, property management of the Building, proceeded to change the locks and dispossess Plaintiff from the Subject Property, in breach of the Lease.

129. Defendants' breach of the Lease have resulted in Plaintiff' inability to operate its business, and lost profits.

**WHEREFORE**, the Plaintiff, Vincent Miller, and Spaceman Music Group, Inc., respectfully request this Court to:

A) Award Plaintiff actual damages in an amount to be determined at trial;

B) Award Plaintiff their court costs; and

C) Grant Plaintiff such further or alternate relief as the Court may deem just and equitable.

## COUNT VII

### TRESPASS

*As to Lacuna, JC&C, Lacek, and Cacciatore*

130. Plaintiff realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

131. On May 9, 2016, without prior notice or authorization from Plaintiff, agents of Defendants JC&C, Lacuna, Joseph P. Cacciatore and the Trusts, with Defendant Cacciatore and/or Lacek's consent or command, entered onto the Subject Property without Plaintiff' consent and changed the locks to the front door.

132. At no time prior to this, did Plaintiff authorize Defendant JC&C or Lacuna's entry into the Subject Property.

133. Defendants JC&C, Lacuna, Lacek, and Cacciatore had no legal justification for entering the Subject Property due to the fact that they had not filed a forcible entry and detainer action against the Plaintiff nor had they obtained any order for an eviction of the Plaintiff's residence.

134. By so doing, Defendants JC&C, Lacuna, Lacek, and Cacciatore, engaged in intentional trespass onto the Subject Property in violation of Illinois law.

**WHEREFORE**, the Plaintiff, Vincent Miller, respectfully requests this Court:

A)     Award Plaintiff actual damages in the amount of $56,840;

B)     Award Plaintiff their court costs; and

C)     Grant Plaintiff such further or alternate relief as the Court may deem just.

## COUNT VIII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*As to Cacciatore, Lacek, and JC&C*

135. Plaintiff realleges and incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

136. The above-referenced conduct of Defendants Cacciatore, Lacek, and JC&C were extreme and outrageous.

137. Defendants perpetrated blatant and invidious acts of direct discrimination against Plaintiff because of Plaintiff's race.

138. Defendants perpetrated a wrongful eviction upon Plaintiff in violation of the Illinois Forcible Entry and Detainer Act, forcing Plaintiff out the City of Chicago and forcing him to abandon his business, because of Plaintiff's race.

139. The Defendants intended to cause severe emotional distress to Plaintiff, because of his race, or in the alternative, acted with reckless disregard of the high probability that Miller would suffer severe emotional distress due to Defendant's conduct.

140. At all relevant times Defendant knew, or should have known, that abruptly locking Plaintiff out of the Premises, among other things would:

    a.  Jeopardize Plaintiff's ability to conduct a business;

    b.  Interfere with Plaintiff's ability to earn a livelihood;

    c.  Severely affect Plaintiff's mental and emotional state;

d.  Cause Plaintiff to worry and anguish concerning the loss of his business, equipment, and other personal property that Plaintiff cannot afford to replace; and

141.  Defendant knew or should have known that its discriminatory conduct, predicated on Plaintiff's race, would cause severe emotional distress to Plaintiff.

142.  Defendant's outrageous conduct is the actual and proximate cause of Plaintiff's severe emotional distress.

143.  As a result of Defendants' conduct, Plaintiff has been forced to sever his ties to his community, friends, and clients, in Chicago, Illinois, and relocate to Atlanta, Georgia.

144.  As a result of Defendants' conduct, Plaintiff has suffered loss of sleep, loss of appetite, depression, anxiety, due to the loss of his business in Chicago, and feelings of racial inferiority to non-African-American individuals.

145.  The distress inflicted upon Plaintiff through the Defendants' actions has been so severe that no reasonable individual could be expected to endure it.

**WHEREFORE**, the Plaintiff, Vincent Miller, respectfully requests that this Court:

A)  Award Plaintiff compensatory damages in an amount to be determined at trial;

B)  Award Plaintiff compensatory damages for extreme and/or severe emotional distress, in an amount to be determined at trial;

C)  Award Plaintiff punitive damages in an amount of no less than $100,000, or an alternative amount to be determined at trial;

D)  Award Plaintiff the costs of this action, costs of suit, and reasonable attorney's fees; and

E)  Grant such further or alternate relief as it deems just.

Respectfully submitted,
VINCENT MILLER
*Plaintiff*

BY: _____

*One of Plaintiff's Attorneys*

Kevin C. Cruz
Community Activism Law Alliance
17 N. State Street, Suite 1380
Chicago, IL 60602
P: (312) 678-3508
F: (312) 999-0072
kevin@calachicago.org
Atty No. 6312605

## <u>VERIFICATION PURSUANT TO 28 U.S.C.A. § 1746</u>

Vincent Miller, declares, under penalty of perjury that the foregoing is true and correct, except as to matters stated to be on information and belief, and as to such matters Mr. Miller certifies as aforesaid that he verily believes the same to be true.

October 17, 2018
_____
DATE

*Vincent Miller*
_____
Vincent Miller